UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILMER MARTINEZ,
*Plaintiff*,

v.

UNITED STATES OF AMERICA,
*Defendant*.

No. 3:20-cv-01692 (MPS)

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Wilmer Martinez brings this suit against Defendant United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), alleging that on September 10, 2018, Dr. Shutish Patel, who is an employee of the United States Department of Veterans Affairs ("VA"), berated him and that as a result, he suffered emotional distress. Martinez claims that Dr. Patel's conduct qualifies as intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). The United States now moves for summary judgment, arguing that Martinez failed to provide sufficient evidence of causation because he did not disclose any experts. ECF No. 15. For the reasons set forth below, I deny the motion for summary judgment.

I.     **FACTUAL BACKGROUND**

The following facts are taken from the parties' Local Rule 56(a) Statements and the record and are undisputed unless otherwise indicated.

Martinez is a wheelchair-bound veteran, ECF No. 16 ¶ 1; ECF No. 19-1 ¶ 1, who receives treatment from the VA for his "severe depression, severe anxiety, migraine headaches, nightmares, … upper [and] lower back problems[,] pain, … [and] incontinen[ce] issues." ECF

1

No. 16-2 at 37.[1]  Dalila Cruz is Martinez's fiancée and caregiver, meaning that she assists him with his "daily living" needs.  ECF No. 19-2 at 7, 9.  At the relevant time, Cruz usually brought Martinez to his appointments at the VA.  *Id.* at 11–12.

### A. Martinez's Experience with the VA

In an earlier lawsuit brought by Martinez against the United States under the FTCA in 2017, Martinez alleged that from 2013 to 2015, he was a victim of extortion by a Vocational Rehabilitation Counselor, who was affiliated with the VA.  ECF No. 16 ¶ 4; ECF No. 19-1 ¶ 4; *see also Martinez v. United States of America*, 3:17-cv-2135-JBA (D. Conn.).  As a result of the alleged extortion, Martinez claimed that his subsequent experiences with the VA on this issue were "excruciating," causing him "aggravation," "chronic anxiety," and "major depression exacerbation."  ECF No. 16 ¶ 4; ECF No. 19-1 ¶ 4.  Martinez also alleged that the VA's misconduct "caused [him] a vast disturbance of aggravation, to which [sic] he experienced sleepless nights of worries and chronic pain flare-ups [of] his service-connected physical and mental disabilities" and caused him to develop symptoms of "chronic paranoia."  ECF No. 16 ¶ 4; ECF No. 19-1 ¶ 4.  On May 11, 2018, Martinez voluntarily dismissed the lawsuit after the United States moved to dismiss the complaint.  ECF No. 16 ¶ 5; ECF No. 19-1 ¶ 5.

---

[1] I reject Martinez's argument that I may not consider the medical records submitted by the United States "[b]ecause those documents are uncertified."  ECF No. 19-1 ¶ 2; *see also id.* ¶¶ 3, 11, 13.  The records themselves bear indicia that they are indeed records of a VA medical facility and reflect Martinez's treatment.  *See e.g.*, ECF No. 17 at 1 (document footer: "Martinez, Wilmer [notation purporting to be his Social Security Number] System: VISTA.WEST-HAVEN.MED.VA.GOV"); *id.* at 13–14 (release of information from the VA Connecticut Healthcare System), *id.* at 61–63 (download request for Martinez's records from the VA's online portal); *see* Fed. R. Evid. 901(b)(4) (listing as one example of "evidence sufficient to support a finding that the item is what the proponent claims it is" "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances").  Further, Martinez submits no evidence suggesting that the documents are not genuinely his medical records.  In any event, on summary judgment, a district court may consider evidence that is not properly authenticated if that evidence can later be "presented in admissible form at trial." *Richardson v. Corr. Med. Care, Inc.*, No. 917CV420MADATB, 2021 WL 6775905, at *4 (N.D.N.Y. Jan. 14, 2021) (quoting *Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 Fed. App'x. 90, 93–94 (2d Cir. 2019)).  There is nothing to suggest—nor does Martinez argue—that the United States could not produce a witness capable of authenticating the medical records at trial.  Thus, I will consider the submitted medical records for the purposes of this ruling.

Martinez saw Dr. Kimberly Corey, a psychologist at the VA, several times before the September 10, 2018 incident. ECF No. 16-2 at 49. In Dr. Corey's progress note on April 4, 2018, she wrote that Martinez reported that he was concerned that he was "being tracked for the purpose of harming him," that he was "[f]earful that his home is under direct surveillance," and that he feared his care at the VA was being "heavily monitored." ECF No. 17 at 1. She wrote that Martinez was upset that day because he felt that certain VA services were "blocked for him because he has been a whistle-blower." *Id.* In Dr. Corey's May 1, 2018 note, she wrote that Martinez "[r]emain[ed] concerned that he 'always needs to watch [his] back' due to fear of retaliation from the VA because he is a 'whistle-blower'" and he spent "time preoccupied with past injury/mistreatment by [the Veterans Benefit Administration ("VBA")] staff or looking out the window trying to ward off potential for future attack." *Id.* at 3. In Dr. Corey's May 22, 2018 note, she wrote that Martinez reported that he felt "highly suspicious, distressed[,] and uncomfortable" and that he "[c]ontinue[d] to fear 'constant retaliation' from the VA because he is a 'whistle-blower.'" *Id.* at 6; *see also id.* at 8 (in another progress note by Dr. Karen Tie, she wrote that Martinez expressed "[h]is perception of being mistreated by the [Veterans Health Administration ("VHA")] and VBA" and that he stated that there was a "[f]ederal probe because of this mistreatment").

### B. The September 10 Incident and Martinez's Subsequent Complaints

Dr. Barwick, who was a neurologist at the VA, treated Martinez until her retirement. ECF No. 16-2 at 10. Around April 2018, Dr. Barwick informed Martinez that she was retiring. ECF No. 19-2 at 14; ECF No. 16-2 at 10. Martinez was disappointed by the news of Dr. Barwick's retirement. *Id.*; *see also* ECF No. 17 at 3 (Dr. Corey noted that Martinez "[s]hared disappointment that Dr. Barwick, who he trusts, is retiring from the VA."). Before her

retirement, Dr. Barwick referred Martinez to Dr. Patel for neurological care.  ECF No. 16-2 at 10–11, 15.  Dr. Patel had treated Martinez once in 2013.  ECF No. 17 at 12; *see also* ECF No. 16-2 at 38 (Martinez stating that Dr. Patel "had also met with [him] in the past so [Dr. Patel] was familiar with [Martinez] as a veteran [who] receives medical treatment within the neurology department").  Martinez and Cruz received a notification letter indicating that he had an appointment with Dr. Patel on September 10, 2018, followed by an appointment with Dr. Corey at 3:00 PM.  ECF No. 19-2 at 14–15.

On September 10, 2018, Cruz and Martinez arrived on time for Martinez's appointment with Dr. Patel at 2:00 PM.  *Id.* at 15–16.  Cruz checked in at a kiosk and then transported Martinez to the neurology waiting area.  *Id.* at 15.  Cruz stated that, usually, Dr. Barwick would greet Martinez in the waiting room and escort him to her office.  *Id.* at 15–16.  By 2:15 PM, Dr. Patel had not appeared, and Cruz and Martinez became concerned.  *Id.* at 16.  Cruz left Martinez in the waiting area and approached a health technician to inquire whether Dr. Patel knew they were waiting for him and whether Dr. Patel was delayed.  *Id.*  The health technician told Cruz that Dr. Patel was "not running late."  *Id.*  Cruz informed the health technician that they were still waiting and that Martinez had another appointment at 3:00 PM.  *Id.*  The health technician stated that she would send Dr. Patel a message.  *Id.* at 17.

At 2:25 PM, Dr. Patel still had not appeared, and Martinez was concerned because he did not want to be late for his 3:00 PM appointment with Dr. Corey.  ECF No. 16-2 at 21.  Cruz and Martinez went to the Vitals room where Martinez asked the health technician if Dr. Patel still planned to see him that day.  *Id.* at 21–22.  The health technician replied that she did not understand, that Dr. Patel was not running late, and that she would send him a message.  *Id.* at 22.  Martinez testified that as the health technician was speaking, Dr. Patel "burst out" of the side

4

door "from within the Vitals room" and "attacked [him] verbally[,] … screaming at [him]." *Id.* Martinez further testified that Dr. Patel "pushed up on [him] quick, invading [his personal] space." *Id.* at 23; ECF No. 19-2 at 18 (Cruz stating that Dr. Patel "rapidly went towards [Martinez's] personal space and he continued yelling at him"). Martinez testified that Dr. Patel "screamed at [him]" the following: "What are you doing here? Why are you here? Dr. Barwick [doesn't] work here." ECF No. 16-2 at 22; *see also* ECF No. 19-2 at 17–18 (Cruz testifying that Dr. Patel was yelling at Martinez and asking him, "Why are you here? Who scheduled you here …?"). Martinez further testified that Dr. Patel "looked paranoid" and "kept on talking down to [him]." ECF No. 16-2 at 22–23. In response to Dr. Patel's questions, Martinez asked him, "Why are you talking to me like that? What do you mean who sent me?" and stated that he was there for his appointment and that "Dr. Barwick referred [him] to [Dr. Patel]." *Id.* at 23. Martinez stated that Dr. Patel did not listen to him and instead, "spazz[ed] out, lash[ed] out on [him], questioning why [he] was there and who sent [him] there." *Id.*; ECF No. 19-2 at 18 (Cruz stating that Dr. Patel did not allow Martinez to explain why he was there). Martinez also stated that after he told Dr. Patel that he had an appointment with Dr. Corey at 3:00 PM, Dr. Patel said, "Well, you go see your psychologist and then I'll decide … whether [I will] see[] [you] or not." ECF No. 16-2 at 28–29. Martinez testified that he "feared for [his] life" during that incident and that he wanted to exit the room but he could not do so because Dr. Patel was obstructing his path. *Id.* at 23–24.

Cruz grabbed Martinez's wheelchair and, after some maneuvering, left the room with Martinez. ECF No. 19-2 at 19. As they reached the elevators, Cruz decided to return to the Vitals room to obtain information from the health technician and, upon entering the Vitals room, she observed that Dr. Patel was no longer there so she "left [Martinez] by the exit doorway

5

between the Vitals room and lobby area." *Id.* at 20. Cruz asked the health technician a few questions and then, "suddenly[,] … Dr. Patel jumps out of the back of the Vitals room doorway, this time even more enraged." *Id.* at 21. Dr. Patel approached Martinez, who "yell[ed] frantically, '[g]o away, go away.'" *Id.* Cruz "yelled at Dr. Patel" for him to "[b]ack up, stay away" but he "was not comprehending" and "very dismissive." *Id.* Cruz also saw that "Dr. Patel had his hand on [Martinez's] wheelchair … so [she] immediately ran to the wheelchair to bring [Martinez] [to] safety." *Id.* After tugging on the wheelchair "several times," Cruz stated that she "finally pull[ed] away and exit[ed] out of the Vitals room towards the elevators." *Id.* During the incident with Dr. Patel, Martinez became incontinent. ECF No. 16-2 at 31–32; ECF No. 19-2 at 31.[2]

Martinez left the neurology department without receiving care and never saw Dr. Patel for care again. ECF No. 16 ¶ 8; ECF No. 19-1 ¶ 8. On the same day at 2:37 PM, Dr. Patel submitted a "neurology outpatient progress note" for Martinez, stating the following:

> Patient appeared to be visibly tense, restless, and agitated. He has previously seen Dr. Barwick for migraines. I had seen him once in 2013 and treated him with Botox injections. There was no follow-up and no feedback in terms of his response. His recent treatment profile indicates that he uses the 9 tabs of sumatriptan given for a 90 day time period in 1 month. Patient and his wife became abrupt with me and started to question my competence and indicated that they would like to see another provider. In reviewing the patient's psychiatric history, it appears that his major problem relates to delusional behavior, anxiety and PTSD. There is no indication that he has any ongoing neurologic issues other than his subjective complaints of migraines. I would advise continuing with sumatriptan for his migraines and close monitoring of his usage. His primary treatment and management should be through the psychiatry service.

---

[2] The United States "denies that the incident took place in the manner alleged by" Martinez and Cruz. ECF No. 15-1 at 3 n.2.

ECF No. 17 at 12.  After leaving the neurology department, Cruz and Martinez went to his next appointment, during which Martinez discussed the incident with Dr. Corey.[3]  ECF No. 16-2 at 49–50.

Martinez and Cruz testified that the incident with Dr. Patel exacerbated Martinez's pre-existing, service-connected injuries, including his nightmares, severe anxiety, depression, paranoia, pain, and issues with incontinence.  ECF No. 16-2 at 42, 47; ECF No. 19-2 at 39; *see id.* at 40 (Cruz describing that after the September 10 incident, Martinez had more frequent nightmares during which he would "wake[] up drenched in sweat[,] calling Dr. Patel's name").  In addition to the pre-existing injuries, Martinez stated that he started experiencing panic attacks, which included "flashbacks of that day," as a result of the incident.  ECF No. 16-2 at 47; ECF No. 19-2 at 39; *see e.g.*, ECF No. 16-2 at 52–53 (Martinez describing a panic attack he had during a session with Dr. Corey because he felt that "someone out there [was] watching [him, who was] associated with Dr. Patel just ready to harm [him]").

On September 24, 2018, Martinez submitted a complaint to the VA's "Director Patient Advocate & Risk Management Department" regarding his appointment with Dr. Patel.  *See* ECF No. 16-4.  Martinez recounted the incident with Dr. Patel, claiming that Dr. Patel denied him medical treatment and acted inappropriately and hostilely towards him.  *Id.* at 1.  In addition, Martinez claimed that Dr. Patel's September 10 "neurology outpatient progress note" had "numerous inaccuracies and discrepancies," *id.* at 3, and that "Dr. Patel failed to view [his] VA system medical records in advance[] in order to provide [him] with adequate medical treatment," *id.* at 4.  Martinez wrote that Dr. Patel only accessed his medical records to acknowledge Dr. Barwick's referral on April 26, 2018 at 2:12 PM.  *Id.*  Martinez requested that "Dr. Patel cease to

---

[3] Neither party submitted a copy of a progress report—if there was one—from this visit with Dr. Corey.

7

provide his opinions and recommendations on [his] VA systems medical records" and that "Dr. Patel should not have access or authority towards [his] VA system medical records or medication management." *Id.* at 6. The complaint was also sent to the chief of the neurology department, Dr. Huned Patwa. ECF No. 16-2 at 54; ECF No. 19-2 at 35.

As a result of the September 24 complaint, Martinez stated that Dr. Patwa restricted Dr. Patel from accessing Martinez's VA system record and asked Dr. Patel to refer Martinez to a neurologist outside of the VA. ECF No. 16-5 at 2; *see* ECF No. 16-2 at 55; ECF No. 19-2 at 36. Cruz testified that Dr. Patwa recommended that Dr. Patel revise his "neurology outpatient progress note" for Martinez because he needed to "conduct a history of [Martinez's] medical records" and "a physical evaluation of [Martinez] before he even submitted the progress note." ECF No. 19-2 at 35; *see also* ECF No. 16-2 at 55–56 (Martinez testifying that Dr. Patwa noted that Dr. Patel did not meet the "medical uniformity standard rules" because he did not conduct a "medical physical assessment" of Martinez or background research on Martinez's medical records before submitting a medical note).

Martinez also filed other requests and complaints related to Dr. Patel's "neurology outpatient progress note." ECF No. 16 ¶ 10; ECF No. 19-1 ¶ 10. On October 10, 2018, Martinez filed a "Request for Amendment of VA System Medical Records," which the VA denied. ECF No. 16-5 at 2–3. In response, on November 16, 2018, Martinez filed a "Statement of Disagreement." *Id.* at 3. On December 9, 2019, Martinez filed a privacy complaint against Dr. Patel, alleging that Dr. Patel accessed his medical records on November 20, 2018 in contravention of Dr. Patwa's stipulation that Dr. Patel refrain from accessing those records. *Id.* at 1, 3. On January 16, 2020, the VA Privacy & FOIA Officer responded to Martinez's privacy complaint, stating that Dr. Patel had accessed Martinez's records on November 20, 2018 to

determine whether he needed to issue a rebuttal to Martinez's Statement of Disagreement. ECF No. 16-6 at 1. Further, the Officer stated that Dr. Patwa had instructed Dr. Patel not to access Martinez's records except for "clinical reasons" and that Dr. Patel's review of Martinez's medical records to address the Statement of Disagreement "falls within that category." *Id.*

### C. Martinez's Medical Care After the September 10 Incident

Martinez continued to see Dr. Corey. In a November 16, 2018 consult request by Dr. Corey, she wrote that Martinez "reported safety concerns given multiple negative encounters involving staff" and that he reported "feeling highly triggered on the VA campus and it appears that coming for services … worsens [Martinez's] condition and limits his ability to access and engage in care." ECF No. 17 at 20. Further, Dr. Corey wrote that Martinez "has been diagnosed with both a delusional disorder (as he fears constant retaliation by VA/VBA staff) and Other Specified Trauma – and Stressor-related Disorder (as [Martinez] has experienced multiple negative experiences at VA which continue to bother him greatly and fuel his distrust in the system as a whole)." *Id.* Dr. Corey concluded that she had "seen [Martinez] for over a year and despite [their] positive rapport, minimal progress has been made towards [Martinez's] goals of care as he is repeatedly triggered by the VA environment which fuels his concerns that he is unsafe here." *Id.* In a July 9, 2021 progress note, Dr. Corey wrote that Martinez felt "'harassed' by the VA's attempts to schedule him for a Primary Care appointment" and that "he was especially bothered that coordination between multiple [primary care] providers was initiated during his Call Center call which he felt indicated that they were replanning a coordinated attack against him." *Id.* at 65–66.

Martinez also had difficulty securing community care or care from a non-VA provider that would be paid for by the VA. ECF No. 16 ¶ 12; ECF No. 19-1 ¶ 12. He testified that he

sought care from three non-VA neurologists but was "turned away" because the VA failed to provide payment to those neurologists. ECF No. 16-2 at 45. Martinez described this experience as "just as humiliating [as] what Dr. Patel did to me … denying me medical treatment." *Id.* He agreed that "VA's failure to adequately get [him] outside neurological care … contributed to [his] mental health struggles" and stated that the struggle to find adequate care was "connected to Dr. Patel" because "[e]verything is connected to him." *Id.* at 46. In Dr. Corey's March 5, 2019 progress note, she wrote that Martinez "question[ed] if negative forces within the VA are to blame for his delays in receiving care in the community and [that] he recounted specific details of negative past interactions with VA/VBA staff that continue to bother him." ECF No. 17 at 52.

## II.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating

the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### III.  DISCUSSION

The United States moves for summary judgment, arguing that Martinez failed to submit sufficient evidence of causation for both his IIED and NIED claims because he did not disclose any experts.  ECF No. 20 at 2.  Specifically, the United States argues that proof of causation in this case requires expert testimony due to (1) Martinez's "substantial preexisting problems" and (2) the other potential causes for his distress, such as his negative interactions or experiences with the VA that do not involve Dr. Patel.  ECF No. 15-1 at 9–10.  I disagree and deny the United States's motion for summary judgment.

"By waiving sovereign immunity 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred,' the FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees." *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) (quoting 28 U.S.C. § 1346(b)(1)).  Because the allegedly tortious conduct in this case occurred in Connecticut, Connecticut law applies.[4]

Under Connecticut law, expert testimony "is required when the question involved goes beyond the field of ordinary knowledge and experience of the trier of fact."  *Bagley v. Adel Wiggins Grp.*, 327 Conn. 89, 103 (2017) (internal quotation marks and citation omitted).

---

[4] Connecticut's requirement that a plaintiff produce expert testimony to prove causation in certain types of cases, which is discussed below, is "substantive" rather than "procedural" under the *Erie* doctrine, *see Hanna v. Plumer*, 380 U.S. 460, 472 (1965) (in diversity cases, "federal courts are to apply state 'substantive' law and federal 'procedural' law …."); the requirement addresses the plaintiff's burden of proof in such cases rather than the admissibility of evidence or some other purely procedural matter.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 752 (3d Cir. 1994) ("As part of the burden of proof, … Pennsylvania's rule [requiring a plaintiff to prove causation in a toxic tort case with expert testimony stated to a reasonable degree of medical certainty] is a substantive one, not in conflict with Federal Rules of Evidence, and thus governs in federal court.").  I therefore apply Connecticut law, rather than any Federal Rule of Evidence, throughout this decision.

"Whether expert testimony is required in a particular case is determined on a case-by-case basis and its necessity is dependent on whether the issues are of sufficient complexity to warrant the use of the testimony as assistance to the … [trier of fact]." *Id.*; *see Sherman v. Bristol Hosp., Inc.*, 79 Conn. App. 78, 88–89 (2003) ("Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person" but expert opinion may not be necessary "when the medical condition is obvious or common in everyday life" or "if the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief." (citations omitted)).

Connecticut courts have made clear that expert testimony is not required to establish causation in a case claiming emotional distress. *See LaBieniec v. Baker*, 11 Conn. App. 199, 204 (1987) ("[E]xpert testimony is not required to prevail on a claim on mental suffering."). To establish a "claim for mental or emotional distress by a fair preponderance of the evidence," *id.* (quotation marks omitted), a plaintiff "must provide sufficient evidence of the distress and that the [defendant's act] was more likely than not the cause of the distress," *id.* at 206. While "[m]ere 'self-serving' testimony is unlikely to suffice," *Packer v. SN Servicing Corp.*, No. 3:04CV1506MRK, 2008 WL 359411, at *13 (D. Conn. Feb. 8, 2008), *on reconsideration in part*, 250 F.R.D. 108 (D. Conn. 2008), a plaintiff "may be able to establish the necessary causation to prevail on his claim" if he "provide[s] some objective evidence in the form of expert testimony or other testimony," *id.*; *see also Ordner v. Kirschner*, No. CV040413046, 2006 WL 3878157, at *4 (Conn. Super. Ct. Dec. 20, 2006) (dismissing plaintiff's NIED claim in part because he failed to "submit any objective evidence, in the form of medical notes, reports, bills,

12

prescriptions or otherwise, or any testimonial evidence other than his own self-serving testimony, in support of his claim for emotional distress").

After reviewing the evidence in the record, I find that Martinez has submitted evidence from which a reasonable juror could find that Dr. Patel's actions caused at least some of his claimed emotional distress. Martinez and Cruz both testified that Martinez became incontinent during the incident with Dr. Patel. A reasonable juror could infer, without the assistance of expert testimony, causation from the close proximity in time between the alleged incident and Martinez's incontinence, concluding that Dr. Patel's berating of him caused Martinez to become so distressed that it triggered his incontinence. *See Doe v. Advisors Healthcare, Inc.*, No. X01CV020170300S, 2005 WL 1089176, at *5 (Conn. Super. Ct. Mar. 24, 2005) (finding that expert testimony was not necessary for causation and damages when plaintiff's family member testified that the day after the alleged sexual assault, plaintiff "was tearful and expressed humiliation and embarrassment," indicating that there was "no break in the chain of causation"). The United States does not argue that any other interactions with the VA caused this particular episode of incontinence.

Martinez and Cruz also testified that the incident exacerbated Martinez's nightmares. Cruz stated that Martinez's nightmares became more frequent and recounted times when he would call Dr. Patel's name during his nightmares. Further, Martinez and Cruz testified that he experienced panic attacks after the incident. The panic attacks often involved flashbacks of the incident with Dr. Patel. Based on this evidence, a reasonable juror could conclude that the September 10, 2018 incident caused at least some of Martinez's distress based on Martinez's and Cruz's descriptions of the nightmares and panic attacks, which appeared to stem directly from the incident. The United States cites no cases in which a Connecticut court decided, as a matter

13

of law, that a plaintiff could not prove emotional distress without an expert because the plaintiff had endured additional stressors beyond the defendant's conduct. And while there may have been "multiple possible sources of the plaintiff's emotional distress" in general, ECF No. 15-1 at 10, the testimony described above links some of Martinez's nightmares and panic attacks directly to the alleged incident with Dr. Patel.

The United States also argues that the "causes of injury to a human's mental health … dwell[] outside the common knowledge of a layperson." ECF No. 15-1 at 8. But Connecticut courts have allowed triers of fact to determine causation for injuries related to the plaintiff's mental health without the assistance of expert testimony. *See Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 448 (2003) (concluding that "there was sufficient evidence from which the jury could find causation" when plaintiff testified that defendant's conduct was the "cause of his emotional turmoil," including his inability to sleep, frequent nightmares, loss of appetite, depression, and sense of isolation from his community); *Riley v. Travelers Home & Marine Ins. Co.*, 173 Conn. App. 422, 442–43 (2017), *aff'd*, 333 Conn. 60 (2019) (rejecting defendant's claim that evidence presented at trial was insufficient to prove causation where plaintiff testified that, as a result of defendant's accusation that plaintiff was an arsonist, he withdrew from his family, friends, and community due his feeling of shame, "he would lie awake at night wondering if the police were going to arrive and arrest him," he withdrew from a business venture, and he felt "frustration, humiliation[,] and fear"); *Doe*, 2005 WL 1089176, at *5 (denying summary judgment, rejecting defendant's argument that expert testimony was required, and finding that, "on the "basis of [his or her] own life experiences," "an average juror" could determine causation and damages from the testimony that the plaintiff felt humiliation and embarrassment as a result of the alleged sexual assault).

14

I conclude that Martinez is not required to produce expert testimony and has submitted sufficient evidence for a reasonable jury to determine that Dr. Patel caused at least some of his claimed distress.[5]

## IV. CONCLUSION

For the reasons above, I deny the motion for summary judgment (ECF No. 15). In addition, I grant the motion to seal Martinez's medical records (ECF No. 18).

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
       June 9, 2022

---

[5] The United States also argued in a footnote that the part of Dr. Patel's conduct involving his preparation of a medical note does not qualify as "outrageous" conduct required for IIED or conduct "likely to result in illness or bodily harm" required for NIED. ECF No. 15-1 at 9 n.3. "An argument 'relegated to a footnote,' however, 'does not suffice to raise [an] issue,'" *Medacist Sols. Grp., LLC v. CareFusion Sols., LLC*, No. 19-CV-1309 (JMF), 2021 WL 293568, at *5 (S.D.N.Y. Jan. 28, 2021) (quoting *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (citing cases)), and, therefore, I decline to address this argument.